959 A.2d 849

Thomas AUMILLER, et ux.

v.

Sumintra AUMILLER.

No. 29, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Oct. 31, 2008.

Laura V. Bearsch (Love, Fleming & Bearsch, LLC, on brief), Bel Air, for Appellant.

John Condliffe (Angela Silverstein, on brief), Towson, for Appellee.

Panel: JAMES R. EYLER, WOODWARD and LAWRENCE F. RODOWSKY (Ret., specially assigned), JJ.

EYLER, JAMES R., J.

Appellants, Thomas and Valerie Aumiller, seek reasonable grandparent visitation with the two children of their deceased

son, Kevin Aumiller, and his former wife, appellee Sumintra Aumiller. The Circuit Court for Baltimore County, applying the best interests of the child standard, awarded appellants visitation over the objection of appellee. While an appeal of that judgment was pending, however, the Court of Appeals announced a modified standard for third party visitation in *Koshko v. Haining*, 398 Md. 404, 921 A.2d 171 (2007). Consequently, this Court vacated the judgment of the trial court and remanded the case for reconsideration based on the new standard. The remand hearing was limited to a determination of whether appellants made the threshold showing of exceptional circumstances, which would then have permitted the court to apply the best interests standard. Concluding that the evidence did not create a *prima facie* case of exceptional circumstances, the trial court granted appellee's motion for judgment. This appeal followed.

Appellants' sole contention is that the trial court erred in concluding that the evidence did not create a *prima facie* showing of exceptional circumstances. In support of this contention, appellants argue that the trial court (1) misinterpreted the test for third party visitation outlined in *Koshko* as precluding it from considering future harm to the children when determining the existence of exceptional circumstances; and (2) erred in concluding that (a) appellee's unjustified past refusal to allow contact between the children and appellants, and (b) appellee's withholding of information from the children about their deceased father were not in and of themselves exceptional circumstances. In response, appellee characterizes these arguments as an attempt to circumvent the threshold test of parental unfitness or exceptional circumstances mandated by *Koshko*, and to move directly to a best interest analysis. We shall address each of these arguments and, finding no reversible error, shall affirm the judgment of the trial court.

### Facts and Proceedings

Appellee married Kevin Aumiller on January 16, 1998, and the couple had two children together, Devon Aumiller, born

August 13, 1998, and Ariella Aumiller, born September 8, 1999 (collectively "children" or "grandchildren"). Appellants learned that appellee was pregnant with Devon, and that she and Kevin planned to marry in what Valerie Aumiller testified was her first meeting with appellee. Valerie further testified that she felt Kevin was not ready to be a father and the couple's decision to marry was rash. Appellants were not present at the wedding.

After Devon was born, Valerie testified that she and Thomas Aumiller frequently invited appellee and Kevin over for meals, but the couple only came on holidays. Kevin explained that appellee did not want to visit appellants. According to Valerie, her requests to come to appellee's home to spend time with Devon were also typically rebuffed, and as a consequence, she was unable to develop a meaningful relationship with her granddaughter.

Appellants did not learn that appellee was pregnant with her second child, Ariella, until Kevin called Valerie the day Ariella was born. Valerie testified that appellee had forbade Kevin from telling her about the pregnancy, whereas appellee claimed that it was Kevin who did not want his parents to know.

Several incidents exacerbated the early tension in the relationship between appellants and appellee. Kevin was addicted to illegal drugs, and shortly after Devon's birth, was hospitalized for an overdose. Appellee called appellants in the middle of the night to tell them the news, and Valerie responded by telling appellee that this would not have occurred if she was "any kind of a wife." Valerie called to apologize the next day, but the animosity created by this exchange appears to have lingered.

Appellants also refused appellee's request to corroborate Kevin's adultery during the couple's divorce proceeding. Appellee and Kevin were divorced on September 25, 2001, with primary custody of Devon and Ariella awarded to appellee, and reasonable visitation granted to Kevin.

Appellants' contact with the grandchildren was limited following the divorce. Valerie drove Kevin to appellee's home for visits, but would wait in the car while Kevin went inside. Valerie testified that her requests to see the grandchildren were consistently refused by appellee and their last communication was in March 2003. Appellee contended that Valerie contacted her only once after the divorce to arrange a visit. Eventually, Valerie concluded that an amicable agreement with appellee regarding visitation was no longer possible and retained the assistance of counsel.

On February 25, 2004, Kevin Aumiller died of a cocaine and heroin overdose. Valerie went with Crystal Aumiller, Kevin's second wife, to tell appellee, but they were forced to leave a note informing her of the death after appellee did not answer the door. Appellants did not communicate with appellee about visiting the grandchildren after Kevin's death.

On August 5, 2004, appellants filed a complaint for reasonable grandparent visitation with Devon and Ariella. In September 2004, the parties were ordered to attend mediation, but they were unable to reach an agreement. That same month, Valerie began doing volunteer work at the grandchildren's school, which included one-on-one reading with the students. Valerie testified that she provided full disclosure to the school principal regarding the dispute between her and appellee prior to beginning the work, but that she never informed appellee of her plan to volunteer at the school.

On October 19, Valerie read with Devon in the hallway as part of her volunteer duties, and had some brief contact with Ariella in the cafeteria during lunch. What precisely was said during these encounters was disputed by the parties, but appellee testified that Devon was confused and upset, and afraid to attend school afterwards.[1] Mary Sizemore, Devon's second grade teacher, testified that Devon seemed confused, but not upset or scared. Valerie received a letter from the

---

1. Candy Sundstrom, a school counselor who met with Devon the day after the incident at the behest of appellee, testified that Devon told her that Valerie said she was Devon's other mother. Valerie denied this.

school after the incident stating that she was no longer permitted to work there and would be arrested if she entered school property.

The trial eventually took place on October 4, 2005, and concluded with the court finding that it was in the best interests of the grandchildren to have some visitation with appellants. The court ordered three-hour visits, once per month for the first three months, followed by regular six-hour visits on the third Saturday of every month. On October 12, 2005, a written judgment setting forth the terms was docketed.

On October 20, 2005, appellee moved to alter or amend the judgment or for a new trial, arguing that she was ordered to allow visitation without any showing that she was unfit or that it was in the children's best interests. On December 13, 2005, the court granted the motion, and on April 6, 2006, the court conducted a new trial.

By stipulation, testimony from the original proceeding was admitted at the new trial, and further testimony was received from appellants, appellee, and additional witnesses. In a memorandum opinion dated June 23, 2006, the trial court concluded that visitation with appellants was in the best interests of the grandchildren. The parties were ordered to attend mediation to discuss the conditions of visitation, and at a review hearing to be held on July 31, 2006, update the court on their progress.

On July 7, 2006, appellee filed a notice of appeal and moved to stay the visitation order. The parties had made no progress through mediation by the July 31 hearing, and on September 13, 2006, the court issued an order granting appellants visitation once per month for three hours, and denying appellee's motion to stay. In the order, the court recognized the "special weight" afforded to decisions made by a fit parent, but noted that it was not required to find exceptional circumstances to award grandparent visitation.

On September 21, 2006, appellee filed a second motion for stay and notice of appeal, arguing that appellants had not

rebutted the presumption that appellee, as a fit parent, was acting in the best interests of her children by refusing visitation. Appellants did not respond to the motion for stay, and on October 24, 2006, the court granted it.

In the period between the filing of appellee's brief and appellants' reply brief in this Court, the Court of Appeals issued its decision in *Koshko v. Haining*, 398 Md. 404, 921 A.2d 171 (2007), addressing the constitutionality of the grandparent visitation statute ("GVS"), Maryland Code (2006 Repl. Vol., 2007 Supp.), § 9–102 of the Family Law Article. *Koshko* newly interpreted the GVS to require a threshold showing of parental unfitness or exceptional circumstances before applying the best interests standard. Both parties conceded, at oral argument before this Court, that *Koshko* modified the analysis required by a trial court in grandparent visitation cases, and they agreed that a remand was required in light of this development. This Court concurred and remanded for further proceedings.

On February 21, 2008, on remand, the trial court conducted a hearing for the limited purpose of receiving evidence and hearing argument on the existence of exceptional circumstances. At the close of appellants' case, the court concluded that appellants had failed to produce legally sufficient evidence of exceptional circumstances, and it granted appellee's motion for judgment.

### Discussion

█ The overarching issue before us is whether appellants established a *prima facie* case of "exceptional circumstances," under the Court of Appeals' holding in *Koshko*, which requires a trial court in grandparent visitation cases to make a threshold determination of parental unfitness or exceptional circumstances before it applies the best interests standard. We shall not attempt to review the history of Maryland law surrounding third party custody and visitation disputes, as that task was already ably performed by the *Koshko* Court, but some brief background is in order.

The threshold test of parental unfitness or exceptional circumstances is not new, but prior to *Koshko,* its application in Maryland was limited to cases in which third parties sought custody, rather than visitation. *Compare McDermott v. Dougherty,* 385 Md. 320, 374–75, 869 A.2d 751 (2005) (requiring proof that a parent is unfit or that extraordinary circumstances exist before a court may apply the best interests standard in third party/parent custody disputes), *with Fairbanks v. McCarter,* 330 Md. 39, 47–48, 622 A.2d 121 (1993) (holding that a threshold showing of parental unfitness or exceptional circumstances is not required in grandparent visitation cases), *overruled in part by Koshko,* 398 Md. 404, 921 A.2d 171. The rationale for this distinction, as outlined in *Fairbanks,* was twofold: first, the plain text of the GVS did not require a threshold showing; and second, visitation was considered a "less weighty matter than outright custody of a child," and therefore, it did not "demand the enhanced protections, embodied in the exceptional circumstances test, [attending] custody awards." 330 Md. at 47–48, 622 A.2d 121; *see also Herrick v. Wain,* 154 Md.App. 222, 231–32, 838 A.2d 1263 (2003) (applying *Fairbanks* in a grandparent visitation dispute), *overruled in part by Koshko,* 398 Md. 404, 921 A.2d 171.

In *Koshko,* the Court of Appeals faced a substantive due process challenge to the constitutionality of the GVS, prompting it to reevaluate the test for third party visitation. 398 Md. at 407, 921 A.2d 171. The constitutionality of the GVS was called into question by the Supreme Court's plurality opinion in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), which struck down a Washington State third party visitation statute under the federal Due Process Clause, in part because it failed to recognize a presumption that fit parents will act in their child's best interest. *See Id.* at 420–26 (discussing *Troxel* and its implications for the constitutionality of the GVS). Thus, in order to save the GVS from *per se* invalidation, the Court of Appeals agreed with this Court's reasoning on that issue and read into the GVS the well established presumption that a fit parent's decisions regarding

custody or visitation with third parties is in the child's best interest. *Id.* at 426–28.

The Court of Appeals next addressed the contention that the GVS was unconstitutional, as applied, because it did not require a threshold finding of parental unfitness or exceptional circumstances. *Id.* at 428. In a departure from *Fairbanks,* the Court acknowledged that visitation matters involve "a lesser degree of intrusion on the fundamental right to parent than the assignment of custody," but that this difference was not "of constitutional magnitude." *Id.* at 431. The Court then concluded that the GVS directly and substantially interfered with the fundamental rights of parents, and was, therefore, subject to a strict scrutiny analysis. *Id.* at 431–32. Applying this standard, the Court determined it was necessary to require a threshold showing of parental unfitness or exceptional circumstances in third party visitation disputes in order to preserve the constitutionality of the GVS. *Id.* at 440.

■ Thus, post-*Koshko,* the analysis in third party custody and visitation disputes is the same, i.e., parents are presumed to act in the best interests of their children, and a court may not apply the best interests standard absent a threshold showing of parental unfitness or exceptional circumstances. *Id.* at 445; *see also Janice M. v. Margaret K.,* 404 Md. 661, 677–80, 948 A.2d 73 (2008).

The factors used to determine the existence of exceptional circumstances in a custody dispute have been well developed through case law. *See McDermott v. Dougherty,* 385 Md. 320, 419, 869 A.2d 751 (2005); *Sider v. Sider,* 334 Md. 512, 532–33, 639 A.2d 1076 (1994); *Monroe v. Monroe,* 329 Md. 758, 775–76, 621 A.2d 898 (1993); *Turner v. Whisted,* 327 Md. 106, 116–17, 607 A.2d 935 (1992); *Ross v. Hoffman,* 280 Md. 172, 191, 372 A.2d 582 (1977). These cases commonly cite the factors outlined in *Hoffman,*[2] and supplement them with additional

---

2. These factors are as follows:

> [T]he length of time the child has been away from the biological parent, the age of the child when care was assumed by the third

factors based on the specific facts and circumstances before the court. Though many of these factors do not neatly translate to the realm of visitation disputes, the exceptional circumstances test is an inherently fact-specific analysis that defies a generic definition, regardless of whether the case concerns custody or visitation. *Janice M,* 404 Md. at 693–95, 948 A.2d 73. With this in mind, we turn to the instant case.

Appellants contend the trial court erred in concluding that appellants had failed to create a *prima facie* showing of exceptional circumstances, which would have permitted the court to apply the best interests standard in determining appellants' request for visitation. *See Koshko,* 398 Md. at 444–45, 921 A.2d 171. Appellants' first argument in support of this contention is that *Koshko* directed trial courts to consider "both present and possible future detriment" to the children in their analysis of exceptional circumstances, and that the trial court here erroneously limited its analysis to present adverse effects. Appellants rely on the following language from *Koshko:* "[T]here must be a finding of either parental unfitness or exceptional circumstances demonstrating the current or *future detriment* to the child, absent visitation from his or her grandparents, as a prerequisite to ... the best interest analysis." 398 Md. at 444–45, 921 A.2d 171 (emphasis added).

■ It is unclear whether the court failed to consider possible future detriment, or instead concluded that the evidence was legally insufficient to show future as well as current detriment, but in either event, we conclude that the evidence was legally insufficient to show future harm. While it is possible for a trial court to find exceptional circumstances based on future detriment to the child, such a finding must be based on solid evidence in the record, and speculation will not

party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, the stability and certainty as to the child's future in the custody of the parent.
280 Md. at 191, 372 A.2d 582.

suffice. As the Court of Appeals observed in *McDermott*, "it is a weighty task ... for a third party ... to demonstrate 'exceptional circumstances' which overcome the presumption that a parent acts in the best interest of his or her children and which overcome the constitutional right of a parent to raise his or her own children." *McDermott*, 385 Md. at 412, 869 A.2d 751. The record here offers only speculative evidence of future harm, which does not overcome this high evidentiary hurdle. The trial court speculated on reasons why there might be an adverse effect in the future, but there was no legally sufficient evidence of such an effect.

With respect to future harm, appellants argue that (1) appellee withheld and will continue to withhold information from the children relating to their deceased father and his blood relatives, e.g., the father's likes, dislikes, medical history, strengths, and weaknesses, and (2) that appellee's unjustified withholding of contact between appellants and the children prevented a bond from forming. Appellants assert that, given the evidence of withholding information of the type identified above, and appellee's refusal to facilitate visitation with appellants, a court should first determine whether the withholding of information and the refusal to permit contact is unjustified. If a court determines that it was, a prima facie showing of exceptional circumstances exists, and a court may then apply the best interests standard.

If we were to adopt appellants' view and conclude that the "possible future detriment" that may occur from withholding information and denying visitation is sufficient to constitute exceptional circumstances, it would render *Koshko*'s threshold requirement superfluous and allow third parties to reach the best interest analysis in virtually every case. We appreciate the unusual situation that exists here due to the death of the father, and appellants' accompanying fear that appellee may withhold information about him from the children, as well as the lack of a prior developed relationship between appellants and the children. Nevertheless, how appellee chooses to inform the children about their father, and who appellee allows her children to associate with, are the type of matters

within the fundamental rights of parents that *Koshko* pains-takingly sought to protect. The *Koshko* Court's explanation of its decision to engraft a threshold finding of parental unfitness or exceptional circumstance onto the GVS—after it had already read into the statute a presumption favoring parental decisions—is instructive on this point:

> A proceeding that may result in a court mandating that a parent's children spend time with a third party, outside of the parent's supervision and against the parent's wishes, no matter how temporary or modifiable, necessitates stronger protections of the parental right. The importance of parental autonomy is too great and our reluctance to interfere with the private matters of the family too foreboding, whether it be in matters of custody or visitation, to allow parental decision-making to remain that vulnerable to frustration by third parties.

398 Md. at 439–40, 921 A.2d 171 (footnote omitted).

Appellants introduced no evidence of possible future detriment to the children as a result of information being withheld, assuming that it was withheld and will continue to be for an indefinite period of time, unless the withholding itself supports a finding of exceptional circumstances. If a mother's refusal to provide certain information to her children, at a specific point in time, amounted to exceptional circumstances, it would eviscerate the strong protections erected by *Koshko* that protect the fundamental rights of parents in visitation disputes. Thus, the evidence did not permit a reasonable inference of future harm, and we agree with the trial court that possible future harm was not supported by the record and did not satisfy the threshold requirement of exceptional circumstances.

 We disagree with appellants that appellee's "unjustified" refusal to facilitate visitation between appellants and the grandchildren necessarily constituted exceptional circumstances. Again, appellants introduced no evidence of possible future harm to the children as a result of lack of visitation, unless the lack of visitation itself supports a finding of excep-

tional circumstances. Appellants do not dispute that appellee is a fit parent, and the law strongly favors the decisions of fit parents concerning the care of their children over the desire of third parties or the subjective judgment of courts. *See McDermott*, 385 Md. at 422–23, 869 A.2d 751 ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children." (quoting *In re Yve S.*, 373 Md. 551, 572, 819 A.2d 1030 (2003)) (internal quotation marks omitted)); *see also Koshko*, 398 Md. at 422–24, 921 A.2d 171 (and cases cited therein). Even though appellants or a court may consider appellee's refusal to allow visitation "unjustified," and disagree with her approach to educating her children about their father, the law presumes these decisions are in the children's best interests absent strong evidence to the contrary. The fact that one parent is deceased only underscores the need for courts to tread lightly when dealing with the fundamental right of parents to control the upbringing of their children. As the trial court observed, "these are very touchy, very difficult situations that I believe [appellee] should be entitled to deal with herself." We do not mean to suggest that the death of one parent could not contribute to a finding of exceptional circumstances, but the lack of visitation, without other evidence of future harm, does not support such a finding.

Finally, we recognize appellants' request that this Court define the term exceptional circumstances, but we decline to do so. Exceptional circumstances are determined on a case-by-case basis. *See Janice M.*, 404 Md. at 693, 948 A.2d 73 ("[E]xceptional circumstances are not established through a rigid test, but rather by an analysis of all of the factors before the court in a particular case.") (footnote omitted). Accordingly, the factors expressly discussed in reported custody cases were not abstract pronouncements, but instead related to the specific facts and circumstances of those cases. *See*

*supra* note 2 and accompanying text. Thus, we cannot formulate a bright line definition or delineate all relevant factors that might exist in a given case. We do note, however, that the *Ross v. Hoffman* factors may be relevant. *See* 280 Md. at 191, 372 A.2d 582. We recognize that if the grandchildren in a given case have a long and frequent history of visitation with the grandparents, lay and/or expert evidence of a detrimental physical or emotional effect on the children as a result of the cessation of visitation may be easier to obtain than in the absence of a prior relationship. Nonetheless, in the absence of a prior relationship, as here, when the evidence is solely that visitation was and is not being permitted, exceptional circumstances do not exist.

In the case before us, there was only a limited relationship between appellants and the grandchildren and necessarily no evidence of current harm to the children from discontinuing the relationship. In addition, there was no evidence of future harm other than appellants' views as to what and when the children should be told or that might be inferred from the lack of visitation. If the lack of visitation, standing alone, constituted exceptional circumstances, the requirement would be meaningless. There must be evidence of harm that results or likely will result from the refusal to provide visitation. Expert testimony may be desirable and, frequently, may be necessary.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**