56 A.3d 338

**In re VICTORIA C.**

**No. 174, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Nov. 26, 2012.

88

92

Samantha Z. Smith (Timchula & Smith PA, on the brief) Westminster, MD, for appellant.

Constance J. Ridgway (Darlene Wakefield, Wakefield & Ridgway, PA, on the brief) Woodstock, MD, for appellee.

Panel: KRAUSER, C.J., ZARNOCH, BERGER, JJ.

BERGER, J.

This case arises from an Order of the Circuit Court for Carroll County granting sibling visitation to Victoria C. ("Victoria"). The circuit court granted supervised visitation to Victoria with her minor siblings, Lance and Evan. The parents of the minor children, George and Kieran, opposed visitation. George and Kieran filed this timely appeal.

On appeal, George and Kieran present one issue for our review, which we have rephrased as follows:

Whether the circuit court erred in granting sibling visitation to Victoria.

For the reasons set forth below, we conclude that the circuit court erred, and accordingly, we reverse the visitation order.

## FACTS AND PROCEDURAL BACKGROUND

Victoria was born on August 25, 1993. Victoria's mother is deceased. Victoria's father, George, married Kieran, Victoria's stepmother, in 2005. George and Kieran have two chil-

dren together, Lance, age five, and Evan, age three. Victoria also has an older brother, William, with whom she shares both parents. Victoria lived with George from birth until March 2009, when she was sent to live with a maternal aunt in Texas. Victoria went to live with her aunt after an abuse allegation against George was sustained. Victoria remained in Texas with her aunt for a period of one year and then returned to Maryland in March 2010.

Upon her return from Texas, George did not allow Victoria to live in the family home, and Victoria was taken into the care and custody of the Carroll County Department of Social Services. The Carroll County Department of Social Services ("CCDSS") petitioned the circuit court to adjudge Victoria as a child in need of assistance ("CINA"). By court order, Victoria was found to be a CINA on April 26, 2010.

As an ancillary action to the CINA proceeding, Victoria sought visitation with her two minor siblings, which George and Kieran opposed. On May 24, 2011, a hearing was held before a Master in the Circuit Court for Carroll County. At the hearing, Victoria presented testimony from CCDSS social worker Michelle Jacobs, Victoria, and Kieran. Jacobs testified that Victoria was doing well in foster care and had expressed a desire to see her siblings. Jacobs testified that there were attempts at family therapy between Victoria and George, but the therapist determined that continued family therapy was not indicated. Jacobs testified that she believed that it was not in Victoria's best interest to have contact with her siblings until some sort of relationship could be established between Victoria and George. Jacobs testified that she believed supervised visitation at the CCDSS would not be adequate.

Victoria testified that she had been close to her siblings before she left home and, since she had been unable to see them, "[i]t has been like a hold, kind of. I just—I miss them. They were an entire section of my life." Victoria also introduced a letter from her therapist, expressing the therapist's views on the appropriateness of visitation from Victoria's

perspective. On cross-examination, Victoria acknowledged that she had no contact with her siblings during the period of time when she was living in Texas. Victoria further acknowledged that she had told the family therapist that she did not want to have any relationship with George. Victoria admitted that she had said her father was "totally evil" and acknowledged that she has a hostile relationship with George.

Victoria called Kieran as an adverse witness. Kieran testified that there were no pictures of Victoria displayed in the family home, but that there were also no photographs of other family members displayed in the home. Kieran acknowledged that when Victoria lived in the family home before leaving for Texas, she had a loving and caring relationship with her brothers.

The CCDSS offered no witnesses. Counsel for George orally presented a motion for judgment at the conclusion of Victoria's case, which was denied. Thereafter, George presented two witnesses, clinical therapist Joan McInerney and himself. McInerney began working with the family after George initially contacted her. McInerney testified that she had seen George individually two to three times and had seen Victoria individually five to six times. Thereafter, she had two joint sessions with both George and Victoria before therapy was discontinued. McInerney testified that she did not believe that George and Victoria were making progress toward reconciliation and both George and Victoria were guarded and emotionally shut down with each other. McInerney testified that she "continued to not recommend sibling visitation because of the unresolved and extreme anger and distrust between [George and Victoria] toward each other."

George testified that Victoria had a close relationship with her brothers while still living in the family home. George testified that he had been involved in counseling with Victoria and attempted to continue counseling. He further testified that he would like to attempt to have some sort of relationship with Victoria, but that Victoria had said that she was not interested in any kind of a relationship. George testified that

he believed it was inappropriate for Victoria to visit with the boys given the strained relationship between George and Victoria. He stated: "I think it could be emotionally damaging to the boys to have an awkward scenario like that. I really think that I need to have at least a neutral relationship with my daughter before she can have a relationship with the two young boys." He expressed concerns that, given Victoria's long absence from her siblings' lives, "what we would be doing is introducing them to a stranger and telling them they should have a relationship with a stranger. Even though she is their sister, they do not know who she is." George reported that his older son, William, does have a relationship with the boys and stays with the family when he is home on vacation from college.

Kieran also testified. She expressed concern regarding the hostility Victoria displays toward George and concern about "how she might, unintentionally, but might influence the relationship between my sons and my husband and my sons and myself." Kieran echoed the same concerns expressed by George, stating: "I don't feel comfortable introducing my two young children to someone I don't already have at least a neutral relationship with." Kieran reported that Lance occasionally asks about Victoria but does not recognize her in the family's wedding photos. Evan does not recall Victoria at all. Kieran testified that when Lance has asked about Victoria, she and George have explained that Victoria is living elsewhere, either in Texas or elsewhere in Maryland.

The Master filed her findings and recommendations on June 15, 2011. The Master recommended that Victoria be allowed visitation with her siblings. The Master found "there is sufficient evidence that exceptional circumstances exist as required [by Maryland law]." George and Kieran timely filed exceptions. On August 25, 2011, Victoria turned eighteen years old.

The circuit court heard argument on the exceptions on September 29, 2011. After the exceptions hearing but before the circuit court issued its opinion, in October 2011, Victoria

informed CCDSS that she was no longer willing to work with the CCDSS in any capacity and that she planned to leave her foster placement the weekend of October 14–16, 2011. As a result, CCDSS care and custody was terminated on October 18, 2011.

The circuit court issued its opinion on February 2, 2012, denying George and Kieran's exceptions. George and Kieran noted a timely appeal on March 2, 2012. While the appeal was pending, George and Kieran filed a motion for reconsideration. Due to the pending appeal to this court, the circuit court did not take any action on the motion for reconsideration. We shall include additional facts, as necessary, in our discussion of the issues.

## STANDARD OF REVIEW

We generally review orders related to visitation or custody applying an abuse of discretion standard. *Brandenburg v. LaBarre*, 193 Md.App. 178, 186, 996 A.2d 939 (2010). "However, where the order involves an interpretation and application of statutory and case law, the appellate court must determine whether the circuit court's conclusions are 'legally correct' under a *de novo* standard of review." *Id.* (quoting *Barrett v. Ayres*, 186 Md.App. 1, 10, 972 A.2d 905 (2009)). The order in the instant case involved the application of the law of third-party visitation to the context of an adult seeking visitation with her siblings, and thus, we review the order *de novo*.

## DISCUSSION

The overarching issue before us is the standard that applies to an adult sibling seeking visitation with her minor siblings, and whether, under the applicable test, the circuit court erred in granting Victoria visitation. We first consider the applicable standard for an adult sibling seeking visitation with minor siblings.

## A. Applicable Standard

George and Kieran argue that the test articulated in *Koshko v. Haining,* 398 Md. 404, 921 A.2d 171 (2007), which considered a constitutional challenge to Maryland's grandparent visitation statute, applies in the context of adult siblings seeking visitation. Victoria argues that the sibling relationship is granted particular protection under Maryland law, and accordingly, siblings are granted a different status than other third parties seeking visitation. For the reasons set forth below, we conclude that the standard articulated in *Koshko* applies to adult siblings seeking visitation with minor siblings.

It is well established that parents "are invested with the fundamental right . . . to direct and control the upbringing of their children." *Id.* at 422, 921 A.2d 171. "As a natural incident of possessing this fundamental liberty interest, [parents] are entitled to the long-settled presumption that a parent's decision regarding the custody or visitation of his or her child with third parties is in the child's best interests." *Id.* at 423, 921 A.2d 171. Accordingly, a court may not impose third-party visitation in a manner that infringes upon a parent's fundamental right to make decisions about the care, custody, and control of his or her children.

In *Koshko, supra,* 398 Md. 404, 921 A.2d 171, the Court of Appeals addressed the issue of third-party visitation within the context of Maryland's Grandparent Visitation Statute ("GVS"). The Court determined that "a threshold showing of either parental unfitness or exceptional circumstances indicating that the lack of grandparental visitation has a significant deleterious effect upon the children who are the subject of the petition" was required before a court could reach the best interests analysis. *Id.* at 441, 921 A.2d 171 (footnote omitted). In reaching this conclusion, the Court explained that "visitation is a species of custody, albeit for a more limited duration." *Id.* at 429, 921 A.2d 171. The Court emphasized that although "the grant or modification of visitation involves a lesser *degree* of intrusion on the fundamental right to parent than the assignment of custody," it did not warrant a lesser degree of

constitutional scrutiny. *Id.* at 430, 921 A.2d 171 (emphasis in original). Rather, the Court explained:

[A]lthough there may be a difference in the degree of intrusion, it is not a difference of constitutional magnitude. Visitation, like custody, intrudes upon the fundamental right of parents to direct the "care, custody, and control" of their children. Through visitation decisions granting such privileges to third parties may tread more lightly into the protected grove of parental rights, they tread nonetheless.... [T]he weight of the footfalls on that territory is sufficiently direct and substantial as to require rigorous scrutiny.

*Id.* at 430–31, 921 A.2d 171. Because grandparent visitation interferes with a fundamental right of the parent, the Court in *Koshko* applied the strict scrutiny standard and determined that "requiring a threshold showing of either parental unfitness or exceptional circumstances indicating that the lack of grandparental visitation has a significant deleterious effect upon the children who are the subject of the petition" was necessary in order "[t]o preserve fundamental parental liberty interests." *Id.* at 441, 921 A.2d 171.

■ We see no reason why the *Koshko* test does not apply in the instant case. George and Kieran clearly possess a fundamental liberty interest in the care, custody, and control of Lance and Evan. As a result, Victoria's petition for visitation must be considered within a framework that safeguards George and Kieran's constitutional right. Victoria argues, however, that there is a "Maryland common law presumption in favor of siblings" articulated in *In re: Tamara R.*, 136 Md.App. 236, 764 A.2d 844 (2000).

■ We first note that *In re: Tamara R.* was decided seven years before the Court of Appeals decision in *Koshko*. *In re: Tamara R.*, therefore, has limited utility to an analysis of third-party visitation post-*Koshko*. Still, assuming *arguendo* that the holding of *In re: Tamara R.* is still good law, it is distinguishable from the instant case. *In re: Tamara R.* involved a minor child, Tamara, who sought visitation with her

minor siblings. Tamara had been adjudicated to be a child in need of assistance and was in the custody of the State; her minor siblings were in the custody of her father, who opposed visitation. While recognizing the father's fundamental right to care, custody, and control of his minor children, the Court concluded:

[T]he State's interest in the protection of a minor child who has been removed from her parent's care is sufficiently compelling to justify over-riding her parent's opposition to visitation with her sibling, if there is evidence that denial of sibling visitation would harm the minor child who is separated from her family; it is not necessary that denial of visitation also would harm the siblings whom the separated child seeks to visit.

*In re: Tamara R., supra,* 136 Md.App. at 254, 764 A.2d 844.

■ In this case, unlike *In re: Tamara R.,* the sibling seeking visitation is an adult.[1] Therefore, *In re: Tamara R.,* in which the Court balanced the parent's constitutional interest against the State's interest in the protection of a minor child, is of limited relevance. Here, there is no State interest implicated. Although *In re: Tamara R.* emphasized the importance of sibling relationships, we do not read *In re: Ta-*

---

**1.** We recognize that Victoria was a minor, who had been adjudicated a CINA, when the visitation petition was initiated. Victoria, however, is now an adult and is no longer under the care and supervision of the CCDSS. We note that Victoria still has the right to seek visitation although she was no longer under CCDSS supervision. As a minor under state supervision, Victoria could seek visitation pursuant to Md.Code (1984, 1999 Repl.Vol.), § 5–525.2 of the Family Law Article ("FL"), which provides: "Any siblings who are separated due to a foster care or adoptive placement may petition a court, including a juvenile court with jurisdiction over one or more of the siblings, for reasonable sibling visitation rights." FL § 5–525.2(b)(1). As an adult, Victoria no longer possesses the statutory right to seek visitation under that section, and no other statute specifically provides for adult sibling visitation. It is well established, however, that "there [is] no statutory limitation on the jurisdiction of courts with respect to whom custody or visitation [can] be awarded." *S.F. v. M.D.,* 132 Md.App. 99, 110, 751 A.2d 9 (2000) (citing *Evans v. Evans,* 302 Md. 334, 488 A.2d 157 (1985)), *overruled on other grounds by Janice M. v. Margaret K.,* 404 Md. 661, 948 A.2d 73 (2008).

*mara R.* to stand for the proposition that, unlike the standard applied for all other third parties seeking visitation, a different standard should apply for adult siblings seeking visitation. We acknowledge that "Maryland courts ... have frequently expressed the view that ordinarily, the best interests and welfare of the children of the same parents are best served by keeping them together to grow up as brothers and sisters under the same roof." *Id.* at 256, 764 A.2d 844. We further recognize that "the sibling relationship has long been recognized as an important one, which will be given significant consideration and protection by courts involving the family." *Id.* at 259, 764 A.2d 844. This relationship, however, has generally been discussed in the context of a sibling relationship between minor children, and in the instant case, the sibling seeking visitation is an adult.

■■■ Some courts have held the right to associate with one's sibling to be a constitutional right, while other courts have declined to hold that there are constitutional grounds for protecting the sibling relationship. *Id.* at 257–59, 764 A.2d 844 (collecting cases from various jurisdictions). We recognize that siblings often enjoy close relationships, and that some courts have held that the sibling relationship enjoys constitutional protection. Maryland courts, however, have not found that the sibling relationship is of constitutional dimension. *See id.* at 257, 764 A.2d 844. In contrast, it is well established that parents enjoy a constitutionally protected, fundamental liberty interest in the care, custody, and control of their children. We believe that in order to safeguard the parents' fundamental liberty interest, courts must apply *Koshko* when considering an adult's petition seeking visitation with her minor siblings.

Third parties seeking visitation are often close family members, including grandparents, stepparents, and siblings, among others. We find no indication in existing Maryland law that suggests that siblings should be subject to a different standard than other third parties when seeking visitation with minor siblings. Although the importance of the sibling rela-

tionship and the closeness of particular sibling relationships may, in some cases, come into consideration when determining whether exceptional circumstances have been demonstrated, we conclude that adult siblings, like all third parties seeking visitation, are subject to the requirements of *Koshko*. Accordingly, we turn to whether Victoria satisfies the standard explicated in *Koshko*.

## B. Applying the *Koshko* Standard

■ The holding of *Koshko* is clear: "[T]here must be a finding of either parental unfitness or exceptional circumstances demonstrating the current or future detriment to the child, absent visitation from [the third party], as a prerequisite to the application of the best interests analysis." *Koshko, supra,* 398 Md. at 444–45, 921 A.2d 171. Applying *Koshko,* we first consider whether Victoria has satisfied this threshold requirement. Victoria does not argue that George and Kieran are unfit parents, and accordingly, we turn to the exceptional circumstances analysis.

■ We have not defined the term exceptional circumstances in past cases, and we decline to do so in the instant case. "Exceptional circumstances are determined on a case-by-case basis." *Aumiller v. Aumiller,* 183 Md.App. 71, 84, 959 A.2d 849 (2008). We have "explained that 'the factors used to determine the existence of exceptional circumstances' have been well established in the context of third-party custody disputes." *Brandenburg v. LaBarre,* 193 Md.App. 178, 190, 996 A.2d 939 (2010) (quoting *Aumiller, supra,* 183 Md.App. at 80, 959 A.2d 849). These factors, however, "do not neatly translate to the realm of visitation disputes." *Aumiller, supra,* 183 Md.App. at 81, 959 A.2d 849. We have also acknowledged that the factors are "not always particularly relevant or helpful" in this context. *Brandenburg, supra,* 193 Md.App. at 190, 996 A.2d 939. The factors considered in custody disputes are:

[T]he length of time the child has been away from the biological parent, the age of the child when care was as-

sumed by the third party, the possible emotional effect on the child of a change in custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, [and] the stability and certainty as to the child's future in the custody of the parent.

*Ross v. Hoffman*, 280 Md. 172, 191, 372 A.2d 582 (1977). We also note that, in the context of third-party visitation cases, we have focused on the ability of the party seeking visitation to show future detriment upon the minor children if visitation is not permitted. *See Brandenburg, supra*, 193 Md.App. at 191–93, 996 A.2d 939; *Aumiller, supra*, 183 Md.App. at 81–84, 959 A.2d 849.

A finding of future detriment "must be based on solid evidence in the record, and speculation will not suffice." *Brandenburg, supra*, 193 Md.App. at 190, 996 A.2d 939 (quoting *Aumiller, supra*, 183 Md.App. at 81–82, 959 A.2d 849). Quoting a third-party custody case, we have explained that "it is a weighty task . . . for a third party . . . to demonstrate exceptional circumstances which overcome the presumption that a parent acts in the best interest of his or her children and which overcome the constitutional right of a parent to raise his or her own children." *Brandenburg, supra*, 193 Md.App. at 190, 996 A.2d 939 (quoting *McDermott v. Dougherty*, 385 Md. 320, 424, 869 A.2d 751 (2005)). Mere "speculative evidence of future harm [to the minor children] does not overcome this high evidentiary hurdle." *Aumiller, supra*, 183 Md.App. at 82, 959 A.2d 849.

Although exceptional circumstances are evaluated on a case-by-case basis, our analysis in two cases is instructive. In *Aumiller, supra*, 183 Md.App. 71, 959 A.2d 849, a circuit court denied visitation rights to the paternal grandparents seeking visitation with their two minor grandchildren, against the mother of the children's objection. The children's father was deceased. The grandparents had a limited relationship with

the grandchildren when they sought visitation, given that the mother did not allow contact between the grandparents and her children. The circuit court concluded that the grandparents had not demonstrated exceptional circumstances. We agreed, finding that there was no evidence of current or future harm to the minor children from the lack of visitation. *Id.* at 85, 959 A.2d 849.

We rejected that grandparents' argument that the parent's withholding of visitation, as well as the withholding of information about the children's father, constituted exceptional circumstances. We noted that adopting such a view "would render *Koshko's* threshold requirement superfluous and allow third parties to reach the best interests analysis in virtually every case." *Id.* at 82, 959 A.2d 849. We explained that "how the [mother] chooses to inform the children about their father, and who [the mother] allows her children to associate with, are the type of matters within the fundamental rights of parents that *Koshko* painstakingly sought to protect." *Id.* at 82–83, 959 A.2d 849. We explained that although a court "may consider [a mother's] refusal to allow visitation 'unjustified,' and disagree with [the mother's] approach to educating her children about their father, the law presumes these decisions are in the children's best interests absent strong evidence to the contrary." *Id.* at 85, 959 A.2d 849. Regarding the type of evidence of harm that third parties might present to satisfy the exceptional circumstances threshold, we noted that "[e]xpert testimony may be desirable and, frequently, may be necessary." *Id.* at 85, 959 A.2d 849. Because we concluded the grandparents had not satisfied the exceptional circumstances requirement, we affirmed the circuit court's denial of visitation. *Id.*

In *Brandenburg, supra,* 193 Md.App. 178, 996 A.2d 939, we considered another grandparent visitation petition. Unlike in *Aumiller,* the grandparents in *Brandenburg* had a close relationship with their grandchildren before the parents disallowed visitation. For at least two years, the grandparents provided occasional care for the children on weekends and holidays, and for a period of over one year, the grandmother

provided free childcare for the children in her home on a daily basis. *Id.* at 180, 996 A.2d 939. The two oldest grandchildren often spent Sunday nights at the grandparents' home so that the mother could attend a Monday morning meeting without waking the children. *Id.* at 181, 996 A.2d 939. After the parties became involved in a personal dispute unrelated to the children, the parents cut off all contact between the grandparents and the minor children. *Id.* The grandparents filed a complaint to establish visitation rights, and the circuit court granted visitation, finding that the exceptional circumstances threshold had been satisfied and that visitation was in the best interests of the minor children. *Id.* at 181, 184–85, 996 A.2d 939.

This Court reversed, concluding that the circuit court erred as a matter of law. *Id.* at 191, 996 A.2d 939. Although there was evidence of a long relationship between the grandparents and the grandchildren, there was "no evidence of harm to the children caused by the cessation or absence of visitation." *Id.* The evidence presented at trial indicated that the children were thriving after visitation had been cut off. *Id.* at 192, 996 A.2d 939. Although we recognized that the grandparents and grandchildren had, at one time, a close and loving relationship, we explained:

> The trial court was not permitted to draw an inference from the mere amount of time the children once had spent with the grandparents or the generally loving and bonded relationship they had had with them that the cessation of contact between the appellees and the children had harmed the children. The [grandparents] bore the ultimate burden of showing harm and they failed to present the court with facts from which it could draw a reasonable inference of significant deleterious effect.

*Id.* As a result, we reversed the circuit court's visitation order.

 Turning to the instant case, we emphasize that exceptional circumstances must be evaluated on a case-by-case basis. Victoria had a close relationship with her brothers when they resided in the same home, but she has not had

contact with them since leaving for Texas in March 2009. When Victoria left the family home, her brothers were ages three and eighteen months. Although the older brother, who is now five years old, remembers Victoria, the younger brother, who is now three years old, does not remember Victoria at all.

The circumstances under which Victoria lost contact with her brothers are, however, unique. She left the family home due to an indicated finding of abuse against her father, and Victoria was not permitted to return to the home upon her return from Texas. Victoria was adjudicated to be a CINA and was in the custody of the CCDSS, and repeatedly expressed an interest in visitation with her siblings. Extensive evidence was presented indicating that, at this point, Victoria and George have a very poor relationship, and Victoria expressed that she desired not to have a relationship with George.

Critically, no evidence was presented that the minor children had suffered any negative effect as a result of the absence of visitation with their sister. Victoria presented no expert testimony regarding whether the absence of visitation caused harm to the minor children, which we indicated in *Aumiller, supra,* 183 Md.App. at 85, 959 A.2d 849, "may be desirable and, frequently, may be necessary" to prove exceptional circumstances. There was, however, evidence presented that visitation could actually harm the minor children. George and Kieran expressed concerns that the children would be harmed if visitation commenced, given that the children could be drawn into the middle of a conflict between George and Victoria. Additionally, a clinical therapist recommended against sibling visitation "because of the unresolved and extreme anger and distrust between [George and Victoria] to each other."

Rather than focusing on whether the minor children were harmed by not having visitation with Victoria, both the Master and the circuit court considered the detriment suffered by Victoria from the absence of visitation with her siblings.

While it may be true that Victoria has suffered unfortunate and regrettable harm, harm suffered by an adult as the result of a denial of visitation with minor children is not a consideration in a court's exceptional circumstances analysis. *See Brandenburg, supra,* 193 Md.App. 178, 996 A.2d 939 (not considering harm to grandparents resulting from the denial of visitation); *Aumiller, supra,* 183 Md.App. 71, 959 A.2d 849 (focusing on whether harm to minor children was caused by denial of visitation rather than harm to grandparents). Instead, the focus must be on whether a minor child is harmed by the absence of visitation.

Moreover, harm to a minor child may not be presumed. As in *Brandenburg,* Victoria had a warm and loving relationship with her brothers prior to leaving the family home. Because Lance remembered Victoria and had asked about her, the circuit court "infer[red] that Lance would like to have contact with Victoria, and this raises an inference that there is a significant deleterious effect on Lance by virtue of denying him visitation with his older sister." Such an inference is not appropriate. A court "cannot presume such an effect when, as here, no evidence of harm was adduced." *Brandenburg, supra,* 193 Md.App. at 191–92, 996 A.2d 939. Absent evidence of harm, a court may not presume harm simply because a child asked about a person seeking visitation. The trial judge in the instant case "was not free to speculate about the children's actual condition," nor was the trial court permitted to draw an inference from the mere amount of time the children had once spent with Victoria or the caring relationship they had with Victoria before the cessation of contact. *Brandenburg, supra,* 193 Md.App. at 192, 996 A.2d 939. As did the grandparents in *Brandenburg,* Victoria "bore the ultimate burden of showing harm" to her minor siblings, and she failed to present the court with evidence sufficient to demonstrate a significant deleterious effect.

As we explained in *Brandenburg:*

The bar for exceptional circumstances is high precisely because the circuit court should not sit as an arbiter in

disputes between fit parents and grandparents over whether visitation may occur and how often. In the instant case, the fit parents chose to end contact between their children and the paternal grandparents because of a personal dispute between the parties. Although the trial court may, and did, disagree with this choice, it must defer to the parents' wishes absent proof of significant deleterious effect caused by the cessation of visitation.

*Id.* at 192, 996 A.2d 939. A court may certainly empathize with the plight of an adult sibling seeking visitation, particularly under facts as fraught as those presented in the instant case. Courts must, however, in the absence of proof of significant deleterious effect, abide by the choices of a fit parent to deny visitation. Here, Victoria presented no proof of significant deleterious effect to Lance and Evan. For the foregoing reasons, we shall reverse the visitation order and remand for entry of an order denying Victoria's petition for visitation.

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY REVERSED. APPELLEE TO PAY THE COSTS.**