ADKINS, J.,
dissents which GREENE, J. joins.
Respectfully, I dissent. The Majority overstates the certainty of our jurisprudence on sibling visitation. In so doing, *594 it unwisely pilots the law on parental rights beyond the holdings of our prior cases, as well as the Supreme Court decisions on which they were founded. At the same time, it denies children who are removed from the family without fault of their own the right to maintain a relationship with their siblings. Further, the Majority, adopting the mantle of a fact-finder, substitutes its own factual conclusions for those of the trial court.

The Majority’s Legal Analysis

The Majority derives its certainty regarding our jurisprudence from three cases in which sibling visitation was not even considered. The Majority relies on our holdings in Koshko v. Haining, 398 Md. 404, 921 A.2d 171 (2007), McDermott v. Dougherty, 385 Md. 320, 869 A.2d 751 (2005), and Janice M. v. Margaret K., 404 Md. 661, 948 A.2d 73 (2008). In Koshko we held that grandparents are third parties. See Koshko, 398 Md. at 444-45, 921 A.2d at 195. In McDermott we held that grandparents entrusted with the temporary care of a child are third parties. See McDermott, 385 Md. at 417-18, 869 A.2d at 808. In Janice M. we held that a former live-in life partner that shared parenting duties was a third party. See Janice M., 404 Md. at 685, 948 A.2d at 87. Nonchalantly reducing a child of the family to the status of a third party, the Majority holds that “[o]ur jurisprudence makes clear that third parties are those who are not parents.” (Maj. Op. at 589, 88 A.3d at 763).
Under any fair reading of these cases, taken together, they merely specify that three categories of non-parent adults are third parties. They do not establish that the terms “third party” and “non-parent” are co-extensive and interchangeable. It is inconceivable to me that siblings — half, full or CIÑA— can be third parties vis-á-vis their parents and each other. Although the benefits offered by grandparents to children should not be underestimated, the grandparent-grandchild relationship is lesser and different in character from the unique bond and life-long relationship a person shares with her siblings. Siblings are not third parties to the nuclear *595 family. Rather, they are core members of the family, as close by birth as two humans can be, excepting identical twins.
Sibling relationships are significant because they provide a built-in mutual support system and offer developmental opportunities. See Angela Ferraris, Comment, Sibling Visitation as a Fundamental Right in Herbst v. Swan, 39 New Eng. L.Rev. 715, 718 (2004-05). Importantly, the “ ‘relationships people share with siblings are often the longest-lasting they will ever have.... around after parents, and even spouses and children, are gone.’” Id. at 717 (quoting Diane Crispell, The Sibling Syndrome, 18 Am. Demographics 24, 26 (Aug. 1996)). Indeed, “[a]s siblings age, they may look to each other for understanding, for acceptance, for support, or even for financial assistance. Studies show that adult sibling relationships positively affect sibling well-being.” Paige Ingram Castañeda, Comment, 0 Brother (Or Sister), Where Art Thou: Sibling Standing in Texas, 55 Baylor L.Rev. 749, 774 (2003) (footnote omitted); see also, Ellen Marrus, “Where Have You Been, Fran?” The Right of Siblings To Seek Court Access To Override Parental Denial of Visitation, 66 Tenn. L.Rev. 977, 980-87 (1999) (discussing the importance of the sibling bond).
Some jurisdictions have held the right to associate with one’s sibling to be a constitutional right. See, e.g., Rivera v. Marcus, 696 F.2d 1016, 1026 (2d Cir.1982) (holding that “children surely possess a liberty interest in maintaining, free from arbitrary state interference, the family environment that they have known since birth.”); Aristotle P. v. Johnson, 721 F.Supp. 1002, 1005 (N.D.Ill.1989) (holding that “children[’s] relationships with their siblings are the sort of ‘intimate human relationships’ that are afforded ‘a substantial measure of sanctuary from unjustified interference by the State.’” (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 618, 104 S.Ct. 3244, 3250, 82 L.Ed.2d 462 (1984))); L. v. G., 203 N.J.Super. 385, 398, 497 A.2d 215, 222 (Ch.Div.1985) (holding that “siblings possess the natural, inherent and inalienable right to visit with each other.”). I would not go that far.
*596 Nonetheless, I reinforce the observation made in In re Tamara R. that:
[T]he sibling relationship has been widely recognized as an important one, which will be given significant consideration and protection by courts in cases involving the family. Recognizing the value in sibling relationships puts in perspective the importance of the evidence that [an individual] would be harmed by the denial of sibling visitation.
136 Md.App. 236, 259, 764 A.2d 844, 856 (2000).
To be sure, parents have a fundamental right to raise their children. Yet that right is not absolute, and we should view it in the context of the family situation presented. This Court held in Koshko that the grandparent visitation statute, Md. Code (1984, 2004 Repl. Vol.), § 9-102 of the Family Law Article (“GVS”)[1] was constitutionally faulty because it allowed “third parties ... to disturb the judgment of a parent ... [without] evidence that the parents are either unfit or that there are exceptional circumstances warranting the relief sought[.]” 398 Md. at 440, 921 A.2d at 192 (emphasis added). A CINA child who brings a petition for visitation is forced to do so because something has gone awry within the nuclear family and a member of the nuclear family has been removed — that, in itself, distinguishes this case from the grandparent visitation petitions brought in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) and Koshko. I submit that neither Troxel nor Koshko should be extended to sibling visitation.

The Majority’s Reading Of The Lower Court Proceedings

Assuming, nonetheless, that Koshko controls this case, the Majority incorrectly holds that Circuit Court failed to follow *597 Koshko. I find particularly baffling the Majority’s claim that “the Circuit Court Judge relied on Tamara R., rather than on the applicable Koshko standard!.]” (Maj. Op. at 593, 88 A.3d at 765). As explained below, a straightforward reading of the Circuit Court demonstrates that the court applied Koshko in reaching its decision.
In Koshko, maternal grandparents, facing strenuous objection from the children’s parents, petitioned the circuit court for visitation with their three grandchildren under the GVS. 398 Md. at 410, 921 A.2d at 174. Finding that the grandparents had overcome their constitutional burden and rebutted the presumption in favor of the parents’ determination of the best interests of the children, the trial court granted visitation rights to the grandparents. Id. When the Court of Special Appeals affirmed the trial court, the parents petitioned for certiorari, claiming that the GVS was unconstitutional as applied. Koshko, 398 Md. at 412, 921 A.2d at 175.
This Court held that the GVS needed to be “supplemented by judicial interpretation with an inferred presumption that parental decisions regarding their children are valid.” Koshko, 398 Md. at 425, 921 A.2d at 183 (footnote omitted). We did so because the statute did not acknowledge the role played by parental determinations in assessing the best interests of the child, and because without such a presumption, the statute would be invalid under Troxel. Koshko, 398 Md. at 426-28, 921 A.2d at 183-185. We further explained:
[I]f third parties wish to disturb the judgment of a parent, those third parties must come before our courts possessed of at least prima facie evidence that the parents are either unfit or that there are exceptional circumstances warranting the relief sought before the best interests standard is engaged.
Koshko, 398 Md. at 440, 921 A.2d at 192. Thus, we articulated the standard that any third party pursuing visitation against the wishes of a parent first has to rebut the presumption in favor of the parent by making a showing of either parental unfitness or exceptional circumstances before a court could *598 reach the merits of the petition under the best interests of the children standard. Id.
In this case the Circuit Court clearly applied the Koshko standard, after discussing Tamara R. in the context of a denied motion for judgment. The trial court concluded that George and Kieran successfully rebutted the Tamara R. common law preference in favor of sibling visitation, rendering disposition of this case to be governed by Koshko:
Under the rule of In re Tamara R., the Respondent presented a prima facie argument that she was entitled to visitation with her siblings because she offered evidence that there was harm to herself resulting from the denial of visitation to her minor siblings. Thus, she met her burden as required by Maryland’s common law presumption in favor of siblings seeking visitation of their siblings in contested settings. Thus, the Master appropriately denied the motion for judgment.
Following the Master’s denial of the motion for judgment, George and Kieran C. presented evidence, noted by the Master, of harm to the minor siblings, although the Master did not draw the conclusion that there was harm. In her findings, the Master noted that George had concerns “for his younger children, in terms of the level of vitriol displayed by the Respondent towards him”; that Kieran had concerns over allowing Victoria to have a relationship because of the “level of hostility displayed by the Respondent towards her father”; and that the [sic] Kieran had “concerns for placing young children in the middle of a volatile relationship.”
Accordingly, the Master appropriately afforded the minor children’s parents the opportunity to rebut the presumption in the common law. Thus, In re Tamara R. would seem to instruct that, because the fit parents presented evidence of harm, they rebutted the presumption that arises in'favor of siblings. Upon the conclusion of the case, Victoria C. is left without a presumption in favor of her, and thus must meet the more rigorous test outlined above in Koshko. (Emphasis added.)
*599 The trial court also observed that “the requirements of Kosh-ko ... must be applied here, too[,]” and “Koshko is the minimum bar which state limitations on parents’ fundamental rights must meet, and thus it is the bar over which Victoria C. must pass.”
The Circuit Court then explained the scope of its analysis, stating that “[b]ecause the children in Koshko who were the subject of the petition were the children whom the grandparents sought to visit, the question for this Court to answer is: Is there a significant deleterious effect on Lance and Evan?” The court then, in accordance with Koshko, investigated whether there were exceptional circumstances, before considering the best interests of the children standard. The court concluded that there were indeed exceptional circumstances present in this case. In detailing its finding of exceptional circumstances, the court explained:
Because the Court can infer harmful effects on at least Lance that result in significant deleterious effects of losing the relationship with his sister, because the balance of applicable traditional factors show exceptional circumstances, and because the situation bringing Victoria C. before this Court appears in itself to be an exceptional circumstance, the Court finds that Victoria has met her burden in overcoming the presumption afforded parents in the upbringing of their children under the U.S. Constitution.
The court then concluded that it would be in Lance and Evan’s best interests to have visitation with Victoria:
Lance clearly has asked about Victoria, whom he last saw when he was 3. Victoria had a loving relationship with Lance and Evan before she left the family home. This tends to show that it would be in Lance’s emotional best interests [sic] to see Victoria again. This side of the equation is strengthened by the significance placed upon the sibling relationship. With respect to Evan, there being a loving relationship with Victoria versus not having one favors visitation. While this would ordinarily be balanced by the concerns of the parents, the fact that they are *600 siblings tips the scales in favor of a finding that it is in Evan’s best interests to have visitation with Victoria.
These passages from the Circuit Court’s opinion demonstrate that, contrary to the Majority’s holding, it understood and applied the applicable Koshko standard. (Maj. Op. at 591-92, 88 A.3d at 764-65).
The Majority also criticizes the Circuit Court as:
[F]ocus[ing] primarily on the harm to Victoria, while relying only on building blocks of inferential adverse effects on Lance and Evan; the only finding of harm to Lance or Evan that the Circuit Court Judge made was that Lance remembered Victoria, leading the judge to infer that Lance wanted to visit with her, thereafter, inferring a substantial deleterious effect on Lance as a result of a lack of visitation. There was no evidence on this record which demonstrated that Lance or Evan were harmed from a lack of visitation with Victoria C. Evidence adduced was only to the contrary.
(Maj. Op. at 593, 88 A.3d at 765).
I disagree. The Circuit Court articulated and followed the very legal standard the Majority sanctions. To hold that the court did not apply Koshko or did not consider whether there were exceptional circumstances that applied to Lance and Evan is to ignore the Circuit Court’s words and actions.[2]
*601 The court clearly found that Lance and Evan would suffer harm as a result of being further deprived of visitation with their sister. Although the court did discuss the circumstances surrounding Victoria’s departure and the harm she suffered as a result of not being able to visit with her brothers, to reverse the trial court on grounds that it “focused primarily on Victoria” is to both usurp that court’s fact-finding role and *602 ignore its discretionary powers. Clearly, the trial court considered the impact on both Victoria and the brothers. It is not our function, as an appellate court, to parse the relative strength of the trial court’s various factual findings.
And, as we have explained, “[decisions concerning visitation generally are within the sound discretion of the trial court, and are not to be disturbed unless there has been a clear abuse of discretion.” In re Billy W., 387 Md. 405, 447, 875 A.2d 734, 758 (2005) (citations omitted). The Majority does not explain how the Circuit Court’s determination that visitation would be in the best interests of Lance and Evan was “ ‘well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.’” Dehn v. Edgecombe, 384 Md. 606, 628, 865 A.2d 603, 616 (2005) (quoting North v. North, 102 Md.App. 1, 13-14, 648 A.2d 1025, 1031-32 (1994)).
At the time the ruling was made, Lance and Evan were 3 and 5 years old, respectively. At such a young age, children are unable to conceptualize complicated events like those surrounding Victoria’s departure and the consequences of the changing family dynamic, and are ill-equipped to explain their feelings on the matter with any specificity. Thus, a court could only infer, based on the evidence and testimony submitted to it, that there would be harm or a deleterious effect on such children. Indeed, one is left to wonder what manner of evidence would satisfy the Majority that such young children would be harmed, if the loss of a beloved and remembered older sister is viewed as insufficient.
It is my fear that the Majority announces a standard rendering it effectively impossible to demonstrate that a younger sibling would suffer significant deleterious harm if deprived of visitation with an elder sibling. Indeed, under the Majority’s rule, were George and Kieran to abandon Lance as they have Victoria, Evan would not be able to show that he would suffer significant harm from being deprived of visitation with his older brother. By announcing that the “evidence on th[e] record which demonstrate[s]” harm on the non-petition *603 ing children must rise above evidence that a beloved sibling has disappeared from the visited child’s life, the Majority renders the task of demonstrating such harm unknowable. (Maj. Op. at 591-92, 88 A.3d at 764-65).

The Majority’s Holding Invites Abuse

Finally, I dissent because I believe the Majority’s rule will invite abuse, and present abused children with an impossible choice. Victoria was declared a CIÑA, and a Department of Social Services investigation into allegations of abuse yielded a result of “indicated.” Yet the Majority looks at this situation, involving damage to the entire family unit, and holds that the Circuit Court erred in finding exceptional circumstances.
For reasons that are not quite clear, the Majority construes Victoria’s departure from the home, and her being separated from Lance and Evan, as pertaining only to Victoria. This implies that a finding of exceptional circumstances as to Lance and Evan is markedly different than a finding of exceptional circumstances as to Victoria. Nothing in Koshko supports such a distinction. Rather, Koshko requires that there be exceptional circumstances surrounding the denial of visitation. To hold, as the Majority does, that a sibling being removed from the house under allegations of abuse and later denied reunification with her family is not an exceptional circumstance, is to invite the very abuse I describe.
After this ruling, children like Victoria who believe they are being physically or emotionally abused by a parent face the following Hobson’s Choice: either (a) report the abuse, get declared CIÑA, and leave the custody of their parents while risking having all access to their siblings cut off; or (b) endure the continued physical or emotional abuse. Indeed, under the Majority’s rule, children who leave an abusive household have no recourse to attempt to gain visitation with their siblings unless their former abusers consent to it. I find this result deeply troubling.
The Majority transforms the wishes of parents from presumptively valid to essentially absolute. Even in a case like *604 this, in which the parents demonstrate an inability or unwillingness to care for one of their children, the Majority elects to enhance the protections given to parents at the expense of children who have been forced out of their homes. It would be no great harm to the strong and significant protections given to the wishes of presumptively fit parents, were we to announce a rule that in a unique situation like this, the juvenile court may make a determination harmonious with, if not based on, Md.Code (1994, 2012 Repl. Vol.), § 5-525.2(b) of the Family Law Article.[3] Considering the best interests of all children involved, and allocating significant weight to the wishes of the parents, does not undermine the protection from arbitrary judicial inquiry embedded in Koshko.
For the above reasons, I would reverse the Court of Special Appeals and affirm the judgment of the Circuit Court.
Judge GREENE authorizes me to state that he shares the views set forth in this dissenting opinion.

. Md.Code (1984, 2004 Repl. Vol.), § 9-102 of the Family Law Article provided that:
An equity court may:
(1) consider a petition for reasonable visitation of a grandchild by a grandparent; and
(2) if the court finds it to be in the best interests of the child, grant visitation rights to the grandparent.

. Regarding the younger children, the court found that:
The testimony of both parents, however, is that Lance does remember Victoria. The Court infers that Lance would like to have contact with Victoria, and this raises an inference that there is a significant deleterious effect on Lance by virtue of denying him visitation with his older sister. This probably is enough to meet the exceptional circumstances standard under Brandenburg [v. LaBarre, 193 Md.App. 178, 996 A.2d 939 (2010)] in order to overcome the burden with respect to Lance, however, the Court will also look to the traditional factors in determining exceptional circumstances, as developed in Ross v. Hoffman [, 280 Md. 172, 372 A.2d 582 (1977)].
[A]t the time of the visitation hearing, Victoria had been away from the children approximately two years. Lance was approximately 3 years old, and Evan, 18 months when Victoria left the family home. There is a concern over the possible emotional effect on the children, as testified to by both George and Rieran C. The first appearance of Victoria’s request to visit her siblings appeared September 14, 2010, *601 about four-and-a-half months after she was adjudged CINA (which occurred April 26, 2010). There is no evidence that the relationship between Lance, Evan, George and Kieran is anything but healthy. The uncontroverted testimony is that, prior to Victoria’s leaving the family home, her relationship with Lance was strong; it was less so with Evan, but nevertheless close. The genuineness of Victoria’s desire to visit her siblings appears true, and is uncontroverted. The intensity appears strong. See e.g., Hrg. Tr. at 16 (Q: "Since you have been out of the home, can you tell us what the impact of not seeing them has been on you?” A: “It has been like a hole, kind of. I just — I miss them. They were an entire section of my life.”) Although Joan Mclnerney, a private therapist, testified that Victoria's feelings toward sibling visitation were "[n]ot strong,” the Court discounts this testimony because the purpose of those therapy sessions was aimed at reconciling the relationship between Victoria and George C., which that witness testified she believed was paramount to continuing her therapy.
While there is concern over the possible emotional effect on the children, the applicable traditional factors in determining exceptional circumstances in balance appear to show exceptional circumstances. While Victoria was in Texas, visitation would have been impractical if not impossible. She sought visitation within five months of being adjudged CINA, showing a desire to reestablish a relationship with her siblings. The disruption to the children’s’ [sic] lives seem[s] to be minimal and the benefits to Victoria are great. While the parent-child relationship appears healthy between the two minors and the two parents, that relationship is likely to remain healthy also, despite visitation.
Furthermore, it cannot be ignored that the reason Victoria C. is before the Court and the reason she does not have contact with her siblings to begin with is because she left the family home following a DSS investigation that found an indication of abuse against her father. The plan developed resulted in Victoria’s removal from the family home to her maternal aunt's home in Texas. When circumstances changed, she returned to her home state of Maryland to be placed in a hotel because she was not accepted back into the family home, which resulted in her being taken into the limited guardianship of the State through the Carroll County Department of Social Services. This would also appear to be an exceptional circumstance determined on a "case-by-case” basis, as allowed for in Aumiller [v. Aumiller, 183 Md.App. 71, 959 A.2d 849 (2008) ].

. I also disagree with the Majority’s dictum that Md.Code (1994, 2012 Repl. Vol.), § 5-525.2(b) of the Family Law Article is applicable only "among siblings who are in an out-of-home placement^]” (Maj. Op. at 588, n. 12, 88 A.3d at 762, n. 12). Nothing in the statutory language requires that all the siblings be placed in foster care in order for one sibling to avail herself of the statute. The statute clearly covers siblings that have been separated by foster care. Victoria was placed in foster care and separated from Lance and Evan. The Majority’s bare assertion that the statute is only meant to cover visitation among siblings who are all removed from a home is unsupported by the text or context of this statute.